711 A.2d 444

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Kenneth BROWN, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 10, 1996.

Decided April 15, 1998.

466

470

472

Jack Myers, Philadelphia, for K. Brown.

Catherine Marshall, Philadelphia, for Com., and Robert A. Graci, Harrisburg, Karen A. Brancheau, Philadelphia, for Com., Office of Attorney General.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

NEWMAN, Justice.

Kenneth Brown (Brown) appeals a sentence of death imposed by the Philadelphia Court of Common Pleas following his conviction murder in the first degree,[1] rape,[2] and involuntary deviate sexual intercourse (IDSI).[3] We vacate the judgment of sentence and remand for a new sentencing hearing.

## FACTS

In August of 1993, Valerie Phillips (Phillips) and her two sons, eight-year-old Rahim and three-year-old Rafael, lived in a second floor apartment at 2238 Page Street in Philadelphia. Phillips' boyfriend, Brown, had also been residing with them since early July of 1993. At approximately 10:00 p.m. on August 3, 1993, Phillips went to a friend's house and left Rafael asleep at home with Brown. Rahim was staying with a relative. Phillips stayed out all night and did not return until about 5:00 a.m. the next morning.[4] When she returned, she fell asleep on the floor.

1. 18 Pa.C.S. §§ 2501(a), 2502(a).

2. 18 Pa.C.S. § 3121.

3. 18 Pa.C.S. § 3123.

4. Phillips testified that she had been drinking beer, but she denied using drugs that night.

When she awoke, at roughly 9:00 a.m. and discovered that the defendant and Rafael were not there, she did not become alarmed at first because she knew that Brown often took Rafael to a local park. However, at about 9:00 p.m., after unsuccessfully attempting to locate Rafael or Brown several times, she called the police.

On August 5 and 6, 1993, the police searched her home and the surrounding neighborhood. At nearly 6:00 p.m. on August 6, 1993, while searching the nearby abandoned Rosen Housing Projects at 23rd and Diamond Streets, the police found Rafael's body in an elevator shaft sixteen to twenty feet under a heavy metal grate. Dr. Bennett Preston, an Assistant Medical Examiner for the City of Philadelphia, examined Rafael's body at the scene and later conducted an autopsy. He noted bruises on his forehead, the back of his head, the left upper abdomen, the right outer abdomen, the left lower abdomen, the side of the liver, abrasions on the left upper back and back of the right thigh, a lacerated spleen, and evidence of bleeding in the abdominal cavity. The skin on Rafael's rectum was completely torn away from his anus, showing that someone forcibly placed a hard, blunt object into his anus. Rafael also had suffered massive injuries to his colon.

All tests for sperm and acid phosphatase, an enzyme found in semen, yielded negative results. Dr. Preston explained that Rafael's injuries and massive bleeding, coupled with the estimated sixty-hour time period that the body was left to rot under the grate, made D.N.A.[5] testing impossible.

Dr. Preston determined the cause of death to be multiple blunt force injuries and the manner of death to be homicide. He opined that the child was alive during the infliction of these wounds and finally lost consciousness because of blood loss. According to Dr. Preston, the object that was forced into the boy's rectum could have been a broomstick, a penis, or both. A pillow with blood stains found in Phillips' apart-

5. Deoxyribonucleic acid, or D.N.A., is microscopic material in the nucleus of cells that contains genetic information. In some crimes, D.N.A. evidence from bodily fluids can lead to identification of the perpetrator or perpetrators.

ment suggested to the doctor that the boy's face was shoved into the pillow to stifle his screams.

The police immediately began a search for Brown. From various interviews, they discovered from a neighbor that he had been seen knocking on the door of his mother's residence. The neighbor had a brief conversation with Brown, during which he cried and told her that he loved his mother and that he would be going to jail. Brown also called his sister and told her that he hurt Rafael but did not want to go to jail. That same morning, he visited his employer and told him that he got himself in trouble and would miss a few days of work. He also asked for his paycheck for the week. His employer denied this request.

On August 7, 1993, police in Atlantic County, New Jersey arrested Brown for an unrelated burglary and placed him in prison there. At the time of his arrest, he gave the police two aliases and a false address and social security number. After Brown and other inmates in the Atlantic County prison saw a news story about Raphael's murder that showed a picture of Brown's face, he asked prison officials to separate him from other inmates because he was afraid they would harm him. Brown asked the prison to contact Philadelphia authorities, and he eventually waived extradition and was returned to Philadelphia.

Detectives searched Brown's person and took samples of his hair, saliva and blood. Detective Ivan Pitt took a statement from Brown in which he admitted that he hit Raphael and might have played a bit too rough with him but denied any sexual contact with the boy. He claimed that he unsuccessfully attempted to awaken Rafael in the apartment at 6:00 a.m., attempted C.P.R., and when he could not revive him, carried Rafael outside. The defendant also stated that he left him under the grate because he could not find help and was frightened.

On February 17, 1995, a jury convicted Brown of murder in the first degree, rape, and IDSI. At the conclusion of the penalty phase of the trial, the jury returned a sentence of

death. The trial court denied Brown's post trial motions and formally imposed the sentence of death for first degree murder and no additional sentence for rape or IDSI.

## ISSUES

In this appeal, Brown raises the following issues for our review:

I. Was the verdict finding Brown guilty of first degree murder supported by the weight and sufficiency of the evidence?

II. Did the trial court err when it denied Brown's motion to suppress his statements because the police did not give him *Miranda* warnings at the time of his arrest?

III. Did the trial court err when it denied Brown's motion to suppress the fruits of the police search based on Brown's assertion that the search warrant was invalid on its face because it did not stipulate whether the search was to be a daytime or nighttime search?

IV. Did the trial court err when it allowed the prosecutor to present life-sized slides of Raphael's body to the jury?

V. Did the Commonwealth present sufficient evidence of rape to warrant a jury instruction on this offense during the guilt phase?

VI. Was there sufficient evidence that Raphael was conscious to warrant a charge on the aggravating circumstance of torture during the penalty phase?

VII. Did the trial court err when it allowed the prosecutor to make allegedly prejudicial remarks during his opening statement, closing argument, and penalty phase of trial?

## DISCUSSION

### I.

■ Brown challenges the weight and sufficiency of the evidence to sustain his convictions.[6] He argues that his

---

6. This Court is required to review the sufficiency of the evidence in all capital murder cases. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454

conviction for first degree murder is against the weight and sufficiency of the evidence because his explanation of the circumstances surrounding Raphael's death is more credible than the Commonwealth's version.

In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deductible from the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offenses beyond a reasonable doubt. *Commonwealth v. Marinelli,* 547 Pa. 294, 690 A.2d 203 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1309, 140 L.Ed.2d 473 (1988). To sustain a conviction for first degree murder, the Commonwealth must prove that a human being was unlawfully killed; that the accused did the killing; that the killing was done with malice aforethought; and that the killing was willful, deliberate and premeditated. *Id.* The willful, deliberate and premeditated intent to kill distinguishes first degree murder from all other degrees of murder. *Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293, *cert. denied,* —— U.S. ——, 117 S.Ct. 364, 136 L.Ed.2d 255 (1996). Circumstantial evidence may prove this specific intent to kill. *Id.*

Viewed in the light most favorable to the Commonwealth, the evidence at Brown's trial established that he sexually assaulted three-year-old Raphael brutally by thrusting his penis and/or a blunt object into his anus with such force that he severed the child's rectum. To silence Raphael, Brown repeatedly beat him in the head and elsewhere on his small body. The massive bleeding caused by the injury to Raphael's rectum eventually caused him to lose consciousness and die.

Notwithstanding Brown's attempt to claim that Raphael's death was an accident, his actions after the killing, including concealing the child's battered and bloody body in a secluded

A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *rehearing denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

air shaft and fleeing the jurisdiction, evidence his conscious-ness of guilt and that the death was not an accident. The jury clearly disbelieved Brown's version of the events, and credited the testimony of the Commonwealth's witnesses.

We have found evidence sufficient to sustain a conviction for first degree murder where a defendant brutally killed a twoy-ear-old girl by "obliterating" her genital area, fracturing her skull, scalping her, inflicting a blunt force injury to her torso, and burning areas of her body. *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078 (1993). We stated in that case than "any reasonable human being would realize these injuries will cause death to such an infant." *Id.* at 222, 634 A.2d at 1084. As in *Edmiston*, any reasonable human being would conclude that Brown's unmerciful attack on this defenseless three-year-old boy evidenced malice and a specific intent to kill him. Accordingly, the evidence was sufficient to sustain the jury's verdict of guilty of murder in the first degree.

Section 3123 of the Crimes Code, 18 Pa.C.S. § 3123, which defines the offense of IDSI, provides in pertinent part as follows:

A person commits a felony of the first degree when he engages in deviate sexual intercourse with another person:

(1) by forcible compulsion;

(2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

\* \* \*

(3) who is less than 16 years of age.

18 Pa.C.S. § 3123. The Crimes Code defines "deviate sexual intercourse" as follows:

Sexual intercourse per os or per anus between human beings who are not husband and wife, and any form of sexual intercourse with an animal. The term also includes penetration, however slight, of the genitals or anus of another person with a foreign object for any purpose other

than good faith medical, hygienic or law enforcement procedures.

18 Pa.C.S. § 3101.

■ Dr. Preston testified that a blunt object consistent with a penis or a broom handle had destroyed Rafael's rectum. He also stated that it was possible that someone had forced both a penis and a foreign object into Rafael's anus. This evidence was clearly sufficient to sustain Brown's conviction for IDSI, which can be committed by forcing a penis or foreign object into a victim's anus.

A person commits the crime of rape if he engages in sexual intercourse with another person not his spouse by forcible compulsion. 18 Pa.C.S. § 3121(1). "Sexual intercourse," in addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration however slight; emission is not required. 18 Pa.C.S. § 3101. The "ordinary meaning" of sexual intercourse is not defined in the statute, but it refers to penetration of the vagina by the penis. *See Commonwealth v. Lee*, 432 Pa.Super. 414, 638 A.2d 1006, *appeal denied,* 538 Pa. 643, 647 A.2d 898 (1994) (the "ordinary meaning" of sexual intercourse is vaginal intercourse). In contrast to the IDSI statute, the statutory definition of rape does not include penetration with a foreign object. *Commonwealth v. Hitchcock,* 523 Pa. 248, 249, 565 A.2d 1159, 1160 (1989) (Papadakos, J., concurring) (penetration by an artificial instrument or digit does not constitute "rape" in Pennsylvania).

At the conclusion of the defense case, Brown's attorney moved for a directed verdict and asked the trial court not to charge the jury on the crime of rape because there was insufficient evidence to prove that Brown used his penis to penetrate Rafael's anus. The trial court initially stated that it would grant the motion for a directed verdict and not charge the jury on rape. N.T. February 16, 1995, p. 11—12. Nevertheless, the trial court then reconsidered and denied the motion for a directed verdict, stating that "in the light most favorable to the Commonwealth, there might have been a rape." N.T. February 16, 1995, p. 20.

■ We agree with the trial court that there "might" have been a rape here. However, even when viewed in the light most favorable to the Commonwealth, Dr. Preston's testimony that someone penetrated Rafael's anus with a penis or an object similar to a broom handle established at best a 50 percent likelihood that Brown raped Rafael with his penis. This evidence is not sufficient, as a matter of law, to establish Brown's guilt of rape beyond a reasonable doubt. *See Commonwealth v. Wiley*, 288 Pa.Super. 397, 432 A.2d 220 (1981) (identification testimony that a robbery victim was 50 percent certain that the defendant was the perpetrator is insufficient to sustain the defendant's conviction). Thus, even though the trial court did not impose any additional sentence for the rape charge, we must reverse Brown's conviction for that offense.

■ Regarding Brown's challenge to the weight of the evidence, "a new trial should be awarded when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Marinelli.* As stated previously, the jury chose to reject Brown's story and accept the testimony of the Commonwealth's witnesses. After a thorough review of the record in this case, we conclude that the guilty verdicts for the crimes of first degree murder and IDSI are not against the weight of the evidence.

## II.

Brown next complains that the trial court erred when it denied his motion to suppress a "statement" he made to the prison authorities in New Jersey. While Brown was in prison in New Jersey after his arrest for an unrelated burglary charge, the other inmates saw his picture in a television news report about Raphael's rape and murder. Because he was concerned that the other prisoners might harm him, Brown filed a written request to be segregated from the other prisoners and he later admitted to the prison authorities that he was the suspect sought in connection with Raphael's killing.

Brown filed a pre-trial motion to suppress evidence in which he contended that the request for segregation was inadmissible because he was not given *Miranda*[7] warnings before he completed that request. The trial court denied the motion to suppress because Brown was not subject to custodial interrogation when he requested segregation.[8]

This Court's scope of review of a suppression court's ruling is limited to determining whether the findings of fact are supported by the record and whether the legal conclusions drawn from those facts are in error. *Commonwealth v. Crompton*, 545 Pa. 586, 682 A.2d 286 (1996); *Commonwealth v. Chambers*, 528 Pa. 403, 598 A.2d 539 (1991). When a defendant has appealed an order denying a motion to suppress evidence, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111, *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). If the facts are supported in the record, we are bound by the facts as the suppression court found them and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error. *Id.*

When a defendant gives a statement without police interrogation, we consider the statement to be "volunteered" and not subject to suppression for lack of *Miranda* warnings. *Commonwealth v. Whitley*, 500 Pa. 442, 457 A.2d 507 (1983). Interrogation is police conduct "calculated to, expected to, or likely to evoke admission." *Commonwealth v. Brantner*, 486 Pa. 518, 527, 406 A.2d 1011, 1016 (1979). Although Brown was clearly in custody when he requested

7. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (the police must advise the accused of his right to remain silent before they initiate custodial interrogation).

8. The trial court also held that the Commonwealth could introduce evidence that Brown provided false biographical information when the police arrested him in New Jersey. *Commonwealth v. Davis*, 460 Pa. 37, 331 A.2d 406 (1975)(police are not required to give *Miranda* warnings before they obtain biographical information). Brown does not challenge this ruling.

segregation, he did not make this request in response to any interrogation. Instead, he made this request on his own accord for his safety. Thus, no *Miranda* warnings were required and the trial court did not err when it denied his motion to suppress the statement. Moreover, the Commonwealth did not introduce Brown's request for segregation at trial. Despite arguing that the statement was inadmissible and inculpatory, Brown himself testified that other inmates in the New Jersey prison had seen his photograph on a television news report and recognized him. Based on the record before us, this claim has no merit.

 Brown also argues that the Philadelphia police should have warned him of his constitutional rights while they were returning him to Philadelphia from New Jersey. However, Brown does not allege that the police interrogated him during the transport, nor does he refer to any statements made during that trip that were admitted into evidence.

Detective Pitt, one of the detectives who transported him to Philadelphia, testified that Brown tried to initiate a conversation about the murder while they were at Hahnemann Hospital waiting for blood tests. Detective Pitt told Brown that he would have to wait until they reached homicide headquarters, where the police would advise him of his constitutional rights. Later, at homicide headquarters, the police advised Brown of his *Miranda* warnings before they commenced custodial interrogation. Accordingly, the record establishes that the police did not violate Brown's constitutional rights and that the trial court properly denied the motion to suppress his statements.

## III.

Brown further argues that he is entitled to suppression of physical evidence the police obtained from the apartment he shared with Phillips because the magistrate did not authorize a nighttime search. Rule 2005 of the Pennsylvania Rules of Criminal Procedure provides as follows:

Rule 2005. Contents of Search Warrant

Each search warrant shall be signed by the issuing authority and shall:

* * *

(e) direct that the warrant be served in the daytime unless otherwise authorized on the warrant, PROVIDED THAT, for purposes of the Rules of Chapter 2000, the term "daytime" shall be used to mean the hours of 6 a.m. to 10 p.m.;

Pa.R.Crim.P.2005, 42 Pa.C.S. Rule 2006(g) of the Rules of Criminal procedure provides as follows:

Rule 2006. Contents of Application for Search Warrant

Each application for a search warrant shall be supported by written affidavit(s) signed and sworn to or affirmed before an issuing authority, which affidavit(s) shall:

(g) if a "nighttime" search is requested (i.e., 10 p.m. to 6 a.m.), state additional reasonable cause for seeking permission to search in nighttime. . . .

Pa.R.Crim.P.2006(g), 42 Pa.C.S. Detective Albert Maahs testified during the suppression hearing that he prepared an affidavit for a warrant to search Phillips' apartment, where Brown had temporarily been living. He testified that Phillips, Raphael's mother, told the police that there were possible blood stains on a pillow in the apartment. Detective Maahs requested a nighttime search, and a bail commissioner approved the warrant at 2:35 a.m. on August 7, 1993.

Detective Maahs also testified that the bail commissioner mistakenly signed the warrant form in the area indicated for daytime searches, but then realized his mistake and orally authorized a nighttime search. The detective made the following notation on the warrant:

"There was a misunderstanding between the detective and the commissioner. This warrant is okay for a nighttime search."

N.T., February 10, 1995, pp. 92—100. The bail commissioner then signed the form below Detective Maahs' handwritten

notation. Detective Maahs and several other officers executed the warrant at 3:00 a.m. on August 7, 1993. Thus, the record amply demonstrates that the police complied with the requirements for a nighttime search and that the bail commissioner approved a nighttime search.

In addition, the trial court found that Phillips gave the police permission to search her apartment. When the police arrived at the house to execute the search warrant, a downstairs neighbor let them into Phillips' apartment with a key. In its findings of fact, the trial court found that Phillips gave the police permission to conduct a search. Although there is no direct evidence concerning this issue, Phillips was clearly cooperating with investigation into Rafael's murder, and had previously consented to a search. Furthermore, it was Phillips who alerted the police to the existence of the blood-stained pillow inside her apartment. It is therefore reasonable to infer that Phillips gave the neighbor a key and consented to the search.

## IV.

 Brown also claims that the trial court erred when it permitted the Commonwealth to introduce and show the jury slides of Rafael's body. The admissibility of photographs of a crime scene is within the sound discretion of the trial court and only an abuse of the discretion will constitute reversible error. *Commonwealth v. Saranchak,* 544 Pa. 158, 675 A.2d 268 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 695, 136 L.Ed.2d 617 (1997). Similarly, questions concerning the admissibility of photographs of a murder victim also fall within the sound discretion of the trial judge. *Commonwealth v. McCutchen,* 499 Pa. 597, 454 A.2d 547 (1982). When photographs are gruesome or potentially inflammatory, the trial court must determine whether the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. *Id.* This Court stated the following in *McCutchen:*

A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are

merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

*Id.* at 602, 454 A.2d at 549.

Rafael's murder was truly a horrible, unspeakable crime. Yet, that is the crime for which Brown was on trial, and it is the crime for which Brown was convicted. The photographs of Rafael's tortured and decayed body are indeed unpleasant, as one would expect in a brutal sexual assault and murder of a small child. However, these photographs were probative concerning the element of specific intent to kill. *See McCutchen* (in assessing the intent of the defendant in a murder case, the jury must be aided to every extent possible). Furthermore, the photos showed the area in which Brown dumped Rafael's body and they corroborated Dr. Preston's testimony and assisted him in conveying the results of the post-mortem examination. *See Commonwealth v. Rush*, 538 Pa. 104, 646 A.2d 557 (1994) (even when the condition of the victim's body can be described through the testimony of the medical examiner, such testimony does not obviate the admissibility of photographs).

After viewing these photographs *in camera*, the trial court held that they were admissible. In its Opinion, the trial court held that the photographs were potentially inflammatory, but that they were nonetheless admissible because their probative value outweighed any prejudicial effect they may have had on the jury. The trial court applied the proper legal test, and held that without the slides, "it would have been impossible for a reasonable juror to fully grasp the severity of the wounds inflicted upon the boy." Trial court slip opinion, p. 13. After reviewing the entire record of this case, we

conclude that the trial court did not abuse its discretion when it permitted the Commonwealth to introduce these photos.

Moreover, we reject Brown's claim that the slides were inadmissible because the images they projected were "life-size." The Commonwealth presented some of these photographs using a slide projector, and the Commonwealth admits that the projected image of Rafael's body was approximately the same size as his actual body. (The projected image was two and one-half feet high, and Rafael was two feet and nine inches tall.) Regardless, we decline to hold that the Commonwealth is precluded from using projectors to show slides or photographs to the jury. Instead, we hold that the decision whether to permit the Commonwealth to use images projected onto a screen or smaller photographs rests in the sound discretion of the trial court.

In this case, Brown's three-year-old victim was so small that the projected picture of his corpse was approximately life-sized. However, this fact alone does not amount to an abuse of the trial court's discretion. Accordingly, we hold that the trial court properly weighed the pertinent factors and did not abuse its discretion when it permitted the Commonwealth to display the slides to the jury using a projector.

## V.

Because we hold that the evidence was insufficient to sustain the rape conviction, we will not address the question of whether the evidence was sufficient to warrant a jury instruction on that charge.

## VI.

Brown also asks this Court to hold that the trial court erred when it charged the jury on the aggravating circumstance of torture because there was insufficient evidence that Rafael was conscious and experienced the pain of the skin ripping away from his rectum. He also contends that there is insuffi-

cient evidence that he intended to torture Rafael. We disagree.

 To prove the aggravating circumstance of torture pursuant to Pennsylvania's death penalty statute, 42 Pa.C.S. § 9711(d)(8), the Commonwealth must establish that the defendant intended to cause pain and suffering or was not satisfied with the killing alone. *Commonwealth v. Caldwell,* 516 Pa. 441, 532 A.2d 813 (1987), *rehearing denied,* 520 Pa. 69, 550 A.2d 785 (1988). The specific intent to torture may be proven from the circumstances surrounding the killing. *Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728, *cert. denied,* 484 U.S. 928, 108 S.Ct. 293, 98 L.Ed.2d 253 (1987). In addition, a jury may also rely on medical evidence that the victim was alive while being tortured. *Commonwealth v. Thomas,* 522 Pa. 256, 561 A.2d 699 (1989). When reviewing the sufficiency of the evidence at the penalty phase of a capital case, the Court will draw all reasonable inferences in the Commonwealth's favor. *Commonwealth v. Buehl,* 510 Pa. 363, 508 A.2d 1167 (1986), *cert. denied,* 488 U.S. 871, 109 S.Ct. 187, 102 L.Ed.2d 156 (1988).

 Dr. Preston testified that Rafael died of multiple blunt force injuries to his head, abdomen, and back. In addition, he testified that a penis or broom handle had been thrust into the three-year-old's anus with such force that it ripped the rectum from the abdominal wall causing massive bleeding in the abdomen. He also testified that the massive blood loss would have caused Rafael to lose consciousness. This constitutes sufficient evidence to submit the aggravating circumstance of torture to the jury.

## VII.

 Finally, Brown contends that he is entitled to a new trial because the prosecutor made allegedly prejudicial remarks during his opening statement, closing argument, and penalty phase of trial. It is well-settled that a district attorney must have reasonable latitude in fairly presenting a case to the jury and must be free to present his or her arguments

with logical force and vigor. *Commonwealth v. McNeil,* 545 Pa. 42, 679 A.2d 1253 (1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 1198, 140 L.Ed.2d 327 (1998). The prosecutor is also permitted to respond to defense arguments. *Commonwealth v. Johnson,* 527 Pa. 118, 588 A.2d 1303 (1991). A new trial is not mandated every time a prosecutor makes an intemperate or improper remark. *Commonwealth v. Carter,* 537 Pa. 233, 643 A.2d 61 (1994), *cert. denied,* 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995). We will find reversible error only if the prosecutor has "deliberately attempted to destroy the objectivity of the fact finder" such that the "unavoidable effect" of the inappropriate comments would be to create such bias and hostility toward the defendant that the jury could not render a true verdict. *Commonwealth v. Miles,* 545 Pa. 500, 511, 681 A.2d 1295, 1300 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1472, 137 L.Ed.2d 684 (1997).

The prejudicial effect of a district attorney's remarks must be evaluated in the situation in which they occurred. *McNeil.* The decision to grant a mistrial is within the discretion of the trial judge, who is in the best position to determine the effect of the prosecutor's remark and its effect on the jury. *Commonwealth v. Duffey,* 519 Pa. 348, 548 A.2d 1178 (1988). The trial court's decision to deny a mistrial will not be reversed except for an abuse of discretion. *Id.*

First, Brown challenges the prosecutor's use of the phrase "child murderer" in the following portion of his opening statement:

[PROSECUTOR]: Mr. Brown went to his employer right after the disposal of Rafael's body, and told his employer that he was going to have to be leaving town for a little bit over some family problems, but he'd be back. So we have this kind of evidence about flight and concealment, the sudden disruption of his daily routine in his life with a view toward avoiding detection, apprehension, and arrest as a child murderer. But once his identity—

[DEFENSE COUNSEL]: Objected to as to the "child murderer" statement to this jury.

[PROSECUTOR]: I withdraw.

N.T., February 13, 1995, pp. 63—64. The trial court held that this remark was a fair summary of the evidence. We agree.

When viewed in context, this reference to Brown's attempts to avoid being arrested as a child murderer is not so inflammatory that it rendered the jury incapable of rendering a fair verdict. In an abundance of caution, the prosecutor mitigated any perceived prejudice to Brown when he withdrew this statement in front of the jury. Moreover, the trial court gave the jury two instructions—one before opening statements and another before closing arguments—that the arguments of counsel are not evidence. *Id.* at 52; and N.T., February 16, 1995, p. 24. We must presume that the jury followed these instructions. *Commonwealth v. Baker,* 531 Pa. 541, 614 A.2d 663 (1992). Accordingly, no relief is due for this claim.

Brown objects next to the following portion of the assistant district attorney's opening statement in which he discussed the absence of D.N.A. evidence:

> Also, one might expect in this day and age, there's a big hubbub about D.N.A. testing, and we have some cases D.N.A. is available and when it's possible. In this matter D.N.A. is ruled out. What you would expect with the male penetration of a bodily cavity and ejaculation would be to have ejaculate from which scientists can look and find what the D.N.A. patterns are all about, and so forth. But here, with the rupture of the colon and the tearing away from the rectum and the contents of the bowels emptying, and all this, you end up with a mixture of cross-contaminating body fluids and fecal waste such that D.N.A. analysis, in the opinion of the doctor, was not feasible.

N.T., February 13, 1995, p. 66. Brown contends that the trial judge erred when he permitted the prosecutor to make this statement because the prosecutor improperly relied on the opinion of the assistant medical examiner, who did not even attempt D.N.A. testing.

First we note that Brown technically waived this claim because defense counsel did not lodge a timely objection

to this statement when the prosecutor made it. Brown's Statement of Matters Complained of on Appeal does not refer to these specific remarks in the prosecutor's opening statement, and the trial court did not address this issue in its Opinion. This Court generally applies a relaxed waiver rule in capital cases because of the permanent, irrevocable nature of the death penalty. *Zettlemoyer.* The Commonwealth still argues that application of the relaxed waiver doctrine is unwarranted here because it "sabotages" the trial court's efforts to correct errors. The Commonwealth further asserts that the relaxed waiver doctrine encourages defense attorneys to withhold objections during trial for tactical reasons, and by that create an error upon which this Court may later grant relief. The Commonwealth takes the position that, in such instances, we should only review these waived issues if a defendant raises them in the context of ineffective assistance of trial counsel.

 We share the Commonwealth's concerns. Clearly, the trial court is in the best position to correct trial errors because it hears the objectionable matter and can promptly assess its effect on the jury in the framework of the entire trial. However, we are also concerned about the invidious nature of prosecutorial misconduct and its damaging effect upon fair trials. Thus, in capital cases, this Court will not affirm a sentence of death unless it is satisfied that the defendant's trial is free from prosecutorial misconduct. Because the record in this case provides an adequate basis to resolve this claim, we will do so here despite the technical waiver.

 Regarding the merits of this issue, remarks in a prosecutor's opening statement must be fair deductions from the evidence that he or she in good faith plans to introduce and not mere assertions designed to inflame the passions of the jury. *Commonwealth v. Jones,* 530 Pa. 591, 610 A.2d 931 (1992). The prosecution is not required to conclusively prove all statements made during the opening argument. *Id.* If the prosecutor has a good faith and reasonable basis to believe

that a certain fact will be established, he or she may properly refer to it during the opening argument. *Id.* Even if an opening argument is somehow improper, relief will be granted only where the unavoidable effect is to so prejudice the finders of fact as to render them incapable of objective judgment. *Id.* *See also, Miles.*

Dr. Preston testified that he obtained specimens from Rafael's body and analyzed them for the presence of sperm and acid phosphatase. Both tests were negative. Dr. Preston explained that the inside of the abdominal cavity was bathed with Rafael's blood and also contained fecal matter. Although Brown argues that Dr. Preston's opinion was invalid because he is not an expert in D.N.A. testing, Dr. Preston testified that his job includes obtaining blood and tissue samples for such testing. Thus, he was qualified to testify as an expert in this regard, and the prosecutor properly relied on his opinion during his opening statement. The prosecutor's opening remarks about the infeasibility of D.N.A. testing were therefore fair comments concerning what he expected to prove at trial and do not provide a basis for relief pursuant to *Jones.*

Furthermore, Brown complains that the trial court erred when it permitted the prosecutor to use the words "killer," "murder," and "slayer." Brown claims that these words conjured damaging images that prejudiced him in the minds of the jury. However, when viewed in the context of the entire trial of this gruesome murder, the evidence supported these comments and they do not require reversal.

Brown also accuses the prosecutor of turning his closing argument into a "religious sermon" to unfairly play on the sympathies of the juries, and he argues that the prosecutor committed misconduct when he discussed "ancient law" in his closing argument. This Court has decided several cases in which prosecutors have invoked Bible passages during penalty phase arguments in capital cases. In *Commonwealth v. Whitney,* 511 Pa. 232, 512 A.2d 1152 (1986), the prosecutor argued that the Defendant was evil by likening him to the Prince of Darkness mentioned in the Bible, and other murderers

throughout history. We held that these remarks were permissible in that case because they were responsive to the arguments of defense counsel, and therefore the sentencing verdict was not the product of passion, prejudice, or any other arbitrary factor.

This Court addressed another Bible reference by an assistant district attorney in *Commonwealth v. Henry*, 524 Pa. 135, 569 A.2d 929 (1990), *cert. denied*, 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991), in which a prosecutor made remarks similar to those we permitted in *Whitney*. Mr. Chief Justice Flaherty, who was then Justice Flaherty, stated the following in this Court's majority Opinion:

> Under *Whitney*, the prosecutor's remarks in this case cannot be regarded as having tainted the sentencing verdict. We note, however, that the prosecutorial practice of pushing "oratorical flair" to its limits, and patterning arguments upon remarks that this Court has only narrowly tolerated, *is a dangerous practice we strongly discourage.*

*Henry* at 158, 569 A.2d at 940 (emphasis added). This earnest warning sent a strong message to prosecutors that they should avoid discussing Bible passages and other objectionable material that are close to the limits of permissible advocacy.

Then, more than three years before Brown's trial, this Court decided *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991), *cert. denied*, 504 U.S. 946, 112 S.Ct. 2290, 119 L.Ed.2d 214 (1992), in which the defendant robbed and murdered the victim by beating her to death with a blunt object. The jury convicted Chambers of first degree murder and robbery and sentenced him to death. On appeal, the defendant asserted that the prosecutor overstepped the bounds of permissible "oratorical flair" when he stated the following in his closing argument during the penalty phase: "Karl Chambers has taken a life. As the Bible says, 'and the murderer shall be put to death.'" *Id.* at 585, 599 A.2d at 643. Based on that Bible reference, this Court vacated Chambers' sentence of death and remanded for a new sentencing hearing, stating the following:

> In the past we have narrowly tolerated references to the Bible and have characterized such references as on the limits of "oratorical flair" and have cautioned that such references are a dangerous practice which we strongly discourage. *Commonwealth v. Henry,* 524 Pa. 135, 569 A.2d 929 (1990); *Commonwealth v. Whitney,* 511 Pa. 232, 512 A.2d 1152 (1986). *We now admonish all prosecutors that reliance in any manner upon the Bible or any other religious writing in support of the imposition of a penalty of death is reversible error per se and may subject violators to disciplinary action.*

*Id.* at 586, 599 A.2d at 643 (emphasis added). Nothing could be more clear. Reliance upon the Bible in any manner during a closing argument during the penalty phase is reversible error *per se* pursuant to *Chambers.* Despite this forceful admonition to prosecutors, the assistant district attorney, Hugh Colihan, stated the following in his closing argument:

> [MR. COLIHAN]: There are—*There is a page in that book, it says, it is better that you had a millstone tied around your neck and be cast into the deep, than that you harm a child. This is ancient law,* and it finds its common place in 1995, in the State of Pennsylvania, in that aggravating factor that says, if you murder a child under the age of 12, you will suffer death by lethal injection.

> [DEFENSE COUNSEL]: That's objected to. That is objected to.

> THE COURT: Sustained....

N.T., February 17, 1995, pp. 65—67 (emphasis added). The Commonwealth attempts to argue that these remarks merely stated that the legislature determined that the murder of a young child constitutes an aggravating circumstance, reflecting some "ancient law" that the killer of a young child should suffer serious consequences. We disagree.

Mr. Colihan did not say the word "Bible," but the above italicized language came directly from the Chapter 17, verse 2

of the New Testament's Book of Luke, which states the following:

It were better for him that a millstone were hanged about his neck, and he cast into the sea, than that he should offend one of these little ones.

*Luke* 17:2.[9] The Book of Mark states:

And whosoever shall offend one of these little ones that believe in me, it is better for him that a millstone were hanged about his neck, and he were cast into the sea.

*Mark* 9:42. And the Book of Matthew also contains the following similar language:

But whoso shall offend one of these little ones which believe in me, it were better for him that a millstone were hanged about his neck, and that he were drowned in the depth of the sea.

*Matthew* 18:6. This language is distinctive.[10] The "ancient law" in "that book" is undeniably a direct reference to these Bible passages and a violation of our stern warning to prosecutors in *Chambers*, which explicitly states that any reference to the Bible during the penalty phase is improper and requires reversal.

This Court understands that the defense attorneys and prosecutors sometimes stray from the limits because of zealous argument in impassioned trials such as this one. However, our holding in *Chambers* announced a bright line rule that prosecutors may not invoke the Bible during sentencing hearings in capital cases.[11] Because our holding in *Chambers*

9. All Bible references here are to the King James version.

10. A millstone is either one of two circular stones used for grinding grain or other substance fed through a center hole in the upper stone. Webster's Third New International Dictionary, 1435 (1986).

11. Although the Commonwealth argues that other references to God in the prosecutor's closing statement were fair responses to the testimony of defense witnesses, it does not attempt to make a similar argument regarding this reference to "ancient law." After reviewing the entire record, we conclude that this Bible reference is not justifiable pursuant to the doctrine of fair response.

mandates reversal, section 9711(h)(4) of the Sentencing Code, 42 Pa.C.S. § 9711(h)(4), governs the appropriate remedy for the error in this case. That section provides as follows:

> If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. *If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing.* ...

42 Pa.C.S. § 9711(h)(4) (emphasis added). We are therefore required to vacate the judgment of sentence and remand this matter to the trial court for a new sentencing hearing. Because we vacate the judgment of sentence, this Court will not address Brown's remaining challenges to the penalty phase of his trial.

## CONCLUSION

For the foregoing reasons, we affirm Brown's conviction for first degree murder and involuntary deviate sexual intercourse and reverse Brown's conviction for rape. Because of the prosecutor's Bible reference during the penalty phase, this Court vacates the judgment of sentence for first degree murder and remands this case to the Court of Common Pleas of Philadelphia County for a new sentencing hearing.