**Liberty Place Retail Assocsiates, L.P. v. Israelite School of Universal Practical Knowledge**

C.P. of Philadelphia County, May Term, 2013 No. 02028

*Jason P. Gosselin* and *Katherine L. Villanueva*, for appellant.

*James A. Funt*, for appellee Israelite School of Universal Knowledge.

CEISLER, *J.*, November 7, 2013—

## I. PROCEDURAL HISTORY & FACTS

The instant appeal, filed by petitioner-appellant Liberty Place Retail Associates, L.P. (hereinafter "appellant"), stems from this court's July 24, 2013 denial of its request for permanent injunctive relief which would have prohibited members of respondent-appellee Israelite School of Universal Practical Knowledge (hereinafter "ISUPK") from demonstrating on the sidewalk outside of appellant's mall in downtown Philadelphia.

The parties to this matter are best described as follows: appellant "operates a retail mall known as The Shops at Liberty Place... a 150,000 square foot retail center open to the public [and comprised of] more than 60 separate retail shops, fifteen dining facilities, and an 850-seat food court, [in addition to] a rotunda that is available for rent for special events such as product expositions and private evening parties." Complaint at ¶2. The Shops at Liberty Place (hereinafter "The Shops") are situated between One Liberty Place and Two Liberty Place, two skyscrapers in Philadelphia's Center City district,[1] and allow public access through multiple entrances on Sixteenth Street, Seventeenth Street, Market Street, and Chestnut Street, the bounds of which encompass a square city block.[2]

Appellees are members of the Israelite School of Universal Practical Knowledge ("ISUPK"), a self-described "501(c)(3), faith-based, community organization that responds to the plaques [sic] of poverty-stricken,

---

1. *See About Us*, The Shops at Liberty Place, 2013, http://www.shopsatliberty.com/about-us.html.
2. *See Store Map*, The Shops at Liberty Place, 2013, http://www.shopsatliberty.com/store-map.html.

urban American's through programs such as Education (Adult & Youth); Food Distribution; Rehabilitation (Drug & Alcohol); Spiritual support & counseling."[3] In contrast, The Southern Poverty Law Center deems the ISUPK "an extremist 'Hebrew Israelite' group that preaches hatred of white people, Jews and anyone else who doesn't embrace its radical black separatist ideology."[4]

During November 2012, appellees began conducting demonstrations near The Shops' main entrance at the intersection of Sixteenth and Chestnut Streets. Complaint at ¶¶4, 15, 25. These demonstrations occurred in a "setback space," the area of which was approximately 800 square feet, located between the sidewalk at this location and the entrance to The Shops. *Id.* at ¶15, 26. The setback space is owned by Appellant and is, thus, private property, though public access is allowed so that individuals may enter The Shops from the street outside. *Id.* at ¶16.[5] As characterized by Appellant, the content of Appellees' speech at these demonstrations was hateful and incendiary in nature, and was focused especially on whites, homosexuals, and women, offending some of The Shops' customers and tenants, as well as some passersby. *Id.* at ¶¶22, 28-29; *see also id.* at exs. B-C (two written complaints, one from a customer and one from a tenant).

---

3. *Mission*, Israelite School of Universal Practical Knowledge, Inc., 2011, http://www.isupknonprofit.org/mission.html.

4. *General Yahanna' Discusses Black Supremacist Hebrew Israelites*, Intelligence Report (Fall 2008, No. 131), Southern Poverty Law Center, available at http://www.splcenter.org/get-informed/intelligence-report/browse-all-issues/2008/fall/god-and-the-general.

5. Appellant states in its Complaint that it owns the sidewalk surrounding the setback space and main entrance. Complaint at ¶16; however this averment is erroneous, as said sidewalks are, in fact, public property. *See* N.O.T. July 15, 2013 at 41-43 (Appellant admits that it maintains, but does not own, these sidewalks).

Appellees held approximately six of these demonstrations between late November 2012 and late May 2013. N.O.T. July 15, 2013, at 73, 78, 82-3; Plaintiff's Exhibits, 52-55.

Seeking to put an end to Appellees' intermittently disruptive presence, Appellant filed a Complaint on May 21, 2013, as well as a Petition for an Emergency Special or Preliminary Injunction (hereinafter "Petition"). The Complaint included five separate claims against Appellees (trespass, private nuisance, public nuisance, intentional interference with contractual relations, and unjust enrichment). Appellant requested that this Court permanently enjoin Appellees from demonstrating on Appellant's property and sought damages, attorneys' fees, interest and costs, as well as any other, appropriate relief. Complaint. at ¶¶41-79.

On May 24, 2013, after a hearing, this court granted appellant's petition, issuing a preliminary injunction that barred appellees from "occupying or demonstrating in any manner at the corner of 16th and Chestnut Streets in Philadelphia in the setback space owned and operated by [Appellant]." Ceisler Order, May 24, 2013 at 2. This court's order did not prevent appellees from relocating their demonstrations to the sidewalk area abutting the setback space; however, the order did place several additional restrictions upon appellees to insure that their demonstrations did not violate city ordinances or create a danger to the public. These restrictions included requiring appellees to obtain demonstration permits if required by the city; bans on soliciting without required permits, prohibition on sound amplification in excess of city regulations, and limitations on the use of any platforms

that impeded pedestrian traffic and put pedestrians at risk.

After the issuance of this preliminary injunction, appellees began demonstrating at Sixteenth and Chestnut Streets with more regularity, holding, on average, one per week. *See* plaintiff's exhibits, nos. 56-62 (demonstrations on May 30 and 31, June 1, June 6, June 14, June 21, and June 28, 2013). On June 4, 2013, appellant filed an Emergency Petition for Adjudication of Civil Contempt for Violation of the May 24, 2013 Order, alleging that appellees were demonstrating in a non-peaceful manner and disrupting pedestrian traffic. Emergency Petition at ¶¶8-10. According to appellant, the appellees had increased the size and frequency of their demonstrations immediately following this court's issuance of the May 24, 2013 order, and had begun to direct a portion of their invective towards The Shops.[6] *Id.* at ¶¶16-17. Appellant also alleged that it had continued to receive numerous complaints regarding appellees' demonstrations, and that appellees' behavior had forced appellants to increase its private security presence. *Id.* at ¶¶20-22.

This court deferred adjudication of appellant's emergency petition on June 7, 2013, pending a final hearing regarding appellant's request for permanent injunctive relief.[7] On June 17, 2013, this court decreed that such a

---

6. Specifically, appellant alleged that appellees began accusing The Shops of employing racist practices and suggested that it was not safe to patronize The Shops. Emergency Petition at ¶16-17.

7. Appellant subsequently expressed its desire to withdraw the Emergency Petition. *See* N.O.T., July 15, 2013 at 7 ("[With regard to] that contempt petition, we believe that they did violate the order, but our goal at that point was to try to get to where we are today, where we would have our permanent injunction hearing. We are not interested in having the [Appellees] held in contempt, so we would withdraw that motion.").

hearing would occur on July 15, 2013,[8] supplementing this the following day by issuing an additional order, one which provided for a period of discovery extending through June 28, 2013.

On June 26, 2013, appellees filed a Response to appellant's Emergency Petition for Civil Contempt Adjudication, and maintained that they had abided by the terms of the preliminary injunction. Response at ¶¶1-14. Appellees stated that from June 6, 2013 onwards, they had conducted their demonstrations pursuant to valid permits issued to them by the Managing Director's Office of Philadelphia and that they had ensured compliance with the terms of the permits by both seeking and obeying direction from the Philadelphia Sheriff's Office. *Id.* at ¶¶2, 6-9.[9] Appellees denied that their recent demonstrations included solicitation, incited violence, or obstructed pedestrian traffic. *Id.* at ¶¶5-12. Lastly, appellees asserted that their activities constituted an exercise of their right to free speech and were thus protected under the First Amendment. *Id.* at ¶13. On June 28, 2013 appellees separately filed an answer to appellant's complaint.

The hearings for appellant's request for permanent injunctive relief occurred on July 15 and July 19, 2013. Over the course of these two days, the parties elicited testimony from: Jill Scarlett, the retail manager of The Shops; Richard Munizca, the head of security at The Shops; Kory

---

8. This order was not docketed until June 21, 2013.

9. Appellees explained in later proceedings that they were previously unaware that the setback space surrounding The Shops was private property, and that, upon being informed of this fact, they promptly moved their demonstrations to the public sidewalk. Appellees' Motion to Deny Injunction at 2.

Travis and Michael Washington, members of the ISUPK who both hold the rank of General;[10] Sharon Tice Delcotto of Sponsor Philly Events, a marketing and promotional event firm that has a business relationship with appellant; Robert Allen, Assistant Managing Director to the City of Philadelphia's Managing Director's Office, Special Events Unit; Lieutenant Joseph O'Brien from Philadelphia Police Department's Civil Affairs Unit; and employees of both the City of Philadelphia's Streets Department and Office of Air Management Services. This testimony was supplemented by a copious number of exhibits, including videos and photographs of appellees' demonstrations, letters and emails, demonstration applications and permits, private security logbooks and incident reports, and copies of relevant statutory provisions and ordinances.

Amidst the hearing proceedings, appellant filed a Memorandum of Law in Support of Motion for Permanent Injunction on July 18, 2013, along with a Reply in Further Support of Motion for Permanent Injunction (hereinafter "Reply") on July 19, 2013.[11] Appellant again argued that permanent injunctive relief was warranted, though only on the basis of trespass and private nuisance. Memorandum at 5-9. Appellant did not contend that appellees themselves were physically trespassing on appellant's property;

10. In the context of the ISUPK, the title of "General" denotes a high position of organizational authority. N.O.T., July 15, 2013 at 247. While both Mr. Travis and Mr. Washington hold the same rank, Mr. Washington functions as the ISUPK's treasurer and is Mr. Travis' subordinate. N.O.T., July 19, 2013 at 88-90.

11. Appellant never formally filed a Motion for Permanent Injunction; rather, appellant merely asked for such relief in its initial complaint. Complaint at 18. Appellant's memorandum, which included a proposed order, and Reply were ostensibly filed in support of the nonexistent Motion for Permanent Injunction.

rather, appellant now asserted that appellees were liable for trespass because their demonstrations were causing third parties (pedestrians) to congregate in the privately owned setback space to listen and watch appellees. *Id.* at 5-6. Appellant also asserted that appellees' demonstrations constituted a private nuisance, as their conduct was unreasonable, reckless, and interfered with appellant's use of its private property. *Id.* at 7-9. Finally, appellant stated that the nature of appellees' demonstrations exceeded the bounds of the First Amendment and, thus, that a permanent injunction would not violate appellees' constitutional rights. *Id.* at 9-11; Reply at 2-4.[12]

On July 19, 2013, at the conclusion of the hearings, this court denied appellant's request for permanent injunctive relief. Appellants appealed this court's decision to the Superior Court on August 15, 2013. This court subsequently directed appellant to provide a Statement of Errors pursuant to Pa. R.A.P. 1925(b), which appellant submitted on September 5, 2013.

Appellant's Statement of Errors is reproduced, *verbatim*, herein:

1. Trespass

To the extent that the Court denied the motion for a permanent injunction on the basis that the First Amendment constitutes a defense to a claim for

---

12. Appellees filed a Motion to Deny Injunction on July 22, 2013, which essentially served to rebut the arguments contained in appellant's putative Motion for Permanent Injunction; however, since appellees' motion was both filed and assigned after this court had already denied appellant's request for permanent injunctive relief, it was dismissed as moot.

trespass, the Court erred.

To the extent that the Court denied the motion for a permanent injunction on the basis that the evidence presented did not establish a trespass, the Court erred.

## 2. Nuisance

To the extent that the Court denied the motion for a permanent injunction on the basis that the First Amendment justified the Defendants' creation of a nuisance, the Court erred.

To the extent that the Court denied the motion for a permanent injunction on the basis that the evidence presented did not establish a nuisance, the Court erred.

## 3. Evidentiary rulings

The court unduly limited Liberty Place's ability to present its case by denying Liberty Place the ability to offer highly relevant evidence. Such evidence includes, but is not limited to: (1) evidence offered to show the impact that the defendants' conduct has on the community and the foot traffic at The Shops at Liberty Place, such as testimony from community members regarding the demonstrations and their reactions to the demonstrations; and (2) evidence offered to show the nature and the purpose of the demonstrations (i.e., to attract a large crowd that, in these circumstances, causes a trespass), the intent of the demonstrators, and the likelihood of violence disruption to ensue at or around the demonstrations, such as videos of past demonstrations showing violent and hostile

circumstances.

## II. DISCUSSION

### A. THE EVIDENCE WAS INSUFFICIENT TO PROVE TRESPASS

As described in the Restatement (Second) of Torts (hereinafter "Restatement"), "[o]ne is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally (a) enters land in the possession of the other, or causes a thing or a third person to do so." Restatement §158. The Restatement elaborates on the concept of accountability for third party trespass by stating that "[i]f, by any act of his, [a party] intentionally causes a third person to enter land, he is as fully liable as though he himself enters. Thus, if the [party] has commanded or requested a third person to enter land in the possession of another, the actor is responsible for the third person's entry if it be a trespass." *Id.*, Comment J.

While Pennsylvania has adopted this formulation, *Kopka v. Bell Tel. Co. of Pa.*, 91 A.2d 232, 235 (Pa. 1952), absent the *manifest intent* to cause such an intrusion, an individual is not responsible for a third party's trespass onto another's land. *Murrin v. Rifugato*, 96 A.2d 865, 866-67 (Pa. 1953); *Riggle v. Garber*, 42 Pa. D. & C.2d 35, 37 (Pa. Ct. Com. Pl. 1966).

Here, appellant maintained that appellees intentionally caused others to trespass by compelling them to stand in the setback space while watching appellees' demonstrations. Memorandum at 2-3; N.O.T. July 15, 2013, at 8-10; N.O.T. July 19, 2013, at 133-136; however,

appellant's presented no evidence that appellees directed or encouraged anyone to intrude on appellant's private property, or that they intended for their audience to gather upon the setback space. Clearly, appellee chose to convene their encampment at Sixteenth and Chestnut in order to reach the broadest audience possible. *See* N.O.T. July 15, 2013, at 254-58, 277-78; N.O.T. July 19, 2013, at 84-87; however, there is a distinct difference between picking a location where one can attract a crowd, and *intending* for that crowd to assemble in a specific area. While members of the public may have chosen to stand within the setback space to observe appellees' demonstrations, this did not automatically render appellees liable for such behavior. An audience (or solitary gawkers, for that matter) could have gathered at any place within eye-or-earshot of appellees' demonstrations, whether that was on the sidewalk, within nearby buildings, in the street, or on the setback space, and appellees presumably would have been satisfied. *See e.g.*, N.O.T. July 15, 2013, at 256 (MR. TRAVIS: "I define success by more people listening, paying attention, the media picking it up, [] by more people standing."); N.O.T. July 19, 2013, at 87 (Mr. Washington stating that larger audiences are better). While it is true that a few people occasionally watched the demonstrations from the setback space, there was no evidence that crowds regularly formed or that unsafe conditions were created. Furthermore, citizens are allowed to stand in the setback space and usually do so for all different reasons. As appellees neither directed others to enter on to appellant's private property, nor evinced the intention that such an intrusion occur, this court determined that appellees were not liable for any trespass of its audience members upon the setback space.

## B. THE EVIDENCE WAS INSUFFICIENT TO PROVE PRIVATE NUISANCE

Similarly, there was insufficient evidence to prove that appellees' demonstrations constituted a private nuisance. As defined by the Restatement, and this Commonwealth, private nuisance occurs when a party effects a "non-trespassory invasion of another's interest in the private use and enjoyment of land," Restatement §821D, where "[said] invasion is either: (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." *Id.* at §822; *Dumm v. Dahl*, 913 A.2d 863, 867 (Pa. Super. Ct. 2006). "It is an obvious truth that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference and must take a certain amount of risk in order that all may get on together, [as the] very existence of organized society depends upon the principle of 'give and take, live and let live.'" Restatement §822, Comment G. As such, a private nuisance is actionable only when such an invasion causes significant harm, in that "there must be a real and appreciable interference with the plaintiffs use or enjoyment of his land." *Id.* at §821F; *id.*, at §821F, Comment C.

In light of these parameters, this court found insufficient evidence that appellees had caused the requisite level of harm sufficient to create a private nuisance. For example, though Jill Scarlett and Richard Munizca testified regarding the noise impact of Appellees' demonstrations, their testimony was mere opinion or inadmissible

hearsay, rather than quantifiable evidence. *See* N.O.T., July 15, 2013, at 56 (MS. SCARLETT: "[Appellees' demonstrations are] loud. It really varies. Now that I know, I mean, it varies from speaker to speaker so some speakers are very loud; others aren't so much...I have gone down 17th Street toward the 17th Street entrance, and you can hear them pretty far down."); *Id.* at 191 (similar testimony from Richard Munizca).[13]

Nor did any other witnesses produce proof that appellant was significantly harmed by noise from appellees' demonstrations. Robert Allen, Assistant Managing Director to the City of Philadelphia's Managing Director's Office, Special Events Unit, testified that he was unaware of appellees violating any law or City of Philadelphia policy. N.O.T., July 19, 2013, at 29-30. Lieutenant Joseph O'Brien, from the Philadelphia Police Department's Civil Affairs Unit, stated that only management at the Shops had made sound-related complaints regarding Appellees' demonstrations. *Id.* 65-68. Keith Lemchak, from the City of Philadelphia's Office of Air Management Services, acknowledged that the Civil Affairs Unit did not request that his office take decibel level measurements at appellees' demonstrations. *Id.* at 78-81. In short, appellant only presented evidence that that there was noise of an indeterminate intensity, which did not rise to the level at

---

13. Mr. Munizca also testified that he "had someone to monitor the decibel[] [level of a demonstration] and it was between 95 and 105." *Id.* However, this court deemed this portion of Munizca's testimony inadmissible; appellant's attorney stated that the reading was taken by "somebody out there with a store-bought decibel reading [sic] for our own purposes" who was not qualified as an expert, and appellant failed to offer any reports or records otherwise substantiating Munizca's statement. *Id.* at 192.

which either law enforcement or a relevant city agency would deem intervention necessary. Thus, appellant fell far short of proving that it had been significantly harmed by the volume level of appellees' demonstrations.[14]

Appellant's argument regarding the pecuniary impact of the demonstrations was similarly inadequate. Appellant represented that appellees had caused it to lose money by affecting its ability to hold events in the setback space and retain tenants, and by for cing it to expend additional sums for security and insurance, thereby creating a private nuisance. Memorandum at 8-9. With regards to lost income, appellant did not offer any evidence which showed that appellees' *mere presence* on the sidewalk impeded its desire to use the setback space as it saw fit. *See* N.O.T., July 15, 2013, at 86-87 (testimony from Jill Scarlett); *id.* at 337-344 (testimony from Sharon Tice Delcotto). In addition, despite appellant's initial averments to the contrary, appellees had no effect on The Shops' occupancy rate, nor did appellant provide proof of demonstration-related decreases in store revenue. *See id.* at 93-94 (MR. GOSSELIN [appellant's attorney]: Have you lost any tenants as a result of these demonstrations? MS. SCARLETT: No, we have not.); *id.* at 105-06 (Jill Scarlett testified that she did not obtain any tenant records reflecting a drop in sales). While appellant did have to pay for additional security, none of these demonstrations

---

14. Appellant also maintains that the *content* of appellees' demonstration speeches created a private nuisance. Memorandum at 8-10; *see also* N.O.T., July 19, 2013, at 127-29, 138, 142-48 (Mr. Gosselin (appellant's attorney) referencing, in the context of private nuisance, the signs displayed, the language used, and the topics covered by appellees at their demonstrations). This court will address this argument *infra*, via discussion of the instant matter's First Amendment implications.

resulted in arrests, or even complaints to the police regarding violent behavior. The evidence showed that appellant voluntarily chose to deploy additional security despite the fact that, while irritating and offensive to some, appellees' behavior never posed a danger or security threat. N.O.T., July 19, 2013, at 60-61; N.O.T., July 15, 2013, at 150-51. Nor were appellant's insurance and liability arguments particularly convincing, considering that it was already fully covered in advance of appellees' decision to demonstrative in front of The Shops. *See id.* at 149 (MR. FUNT [appellees' attorney]: There is no additional insurance that [appellant] needs to obtain based on a public demonstration on the corner of 16th and Chestnut by [appellees]? MS. SCARLETT: No.). Accordingly, this court concluded that based on the legal standards required, appellees had not created a private nuisance.

## C. APPELLEES' DEMONSTRATIONS CONSTI-TUTED SPEECH AND CONDUCT THAT WAS PRO-TECTED UNDER BOTH THE UNITED STATES AND PENNSYLVANIA CONSTITUTIONS

Given the nature of appellees' demonstrations, however, the crux of this case is not based in tort law; rather, it is the ability to speak one's mind in the public square. It is well-settled that freedom of speech is a fundamental right, enshrined in the Constitution, and protected from governmental interference by the First and Fourteenth Amendments. *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936); *Near v. Minnesota*, 283 U.S. 697, 707 (1931). This is especially true regarding speech upon matters of public concern, which, given the "profound national commitment to the principle that debate on public issues

should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), "Speech upon matters of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982).

While there is no bright line test for deciding what constitutes an issue of public concern, as opposed to a purely private interest, it remains that this category of speech encompasses a wide variety of topics. *City of San Diego v. Roe*, 543 U.S. 77, 83 (2004). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community...or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011); *see also Thornhill v. Alabama*, 310 U.S. 88, 102 (1940) ("Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period."). A court, in making this determination, must analyze "the content, form, and context of a given statement [or statements], as revealed by the whole record," *Connick*, 461 U.S. at 147-48, "[evaluating] all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 131 S. Ct. at 1216.

While many, including this court, would regard appellees manner of communicating their viewpoints to

be intemperate and offensive, it cannot be said that the content of appellees' speech address matters of public concern. For example, appellees have called Caucasians "the damn devil," labeled women as "whores," belittled homosexuals and Asian-Americans, warned people that Jesus Christ was going to "ambush" and kill them, and displayed graphic pictures of aborted fetuses. *See* plaintiff's exhibits, 11, 13, 108, 122, 124; N.O.T., July 15, 2013, at 58, 66, 305; however, all of these expressions are made in a larger context, namely, appellees' belief that oppression by the white majority, coupled with a lack of adherence to the teachings of the Bible, and the absence of respect for the law, had effected serious harm upon minority groups in this country. *See, e.g*:

MR. TRAVIS: "[W]hen I say the white man is the devil, what I mean is the lies of the institutions, of the religious institutions...the Christianity, the feeling put to black people [that they] are inferior, that those are lies, they are the devil." N.O.T., July 15, 2013, at 272.

MR. TRAVIS: "We treat murder like it is murder. If it is child molestation, like it is child molestation. We treat abortion like it is abortion, and we make it serious, and these things, in my experience as a black man, are not taken serious by most black people." *Id.* at 306.

Member of ISUPK: "How did we get to be the majority of inmates when the white man, he's the majority in this land, but you less than 12% when you think about two million black men locked up[?] Now, let's add the homosexuals. Now, let's add [INDISCERNABLE] on drugs, just out of their mind. That's our nation that's

destroyed." Plaintiff's exhibits, 122.

Member of ISUPK: "Your Christian preachers they ain't never gonna tell you this. They supposed to be a man teaching black people the law. They supposed to teach you not to eat pork, not to be whores, [to] stay with your man, [and] not to commit adultery. Do they teach you that? No, they break you up. Sister, I don't think you need to be with that type of man. You can find you another man. Turning our sister into a ho." Plaintiff's exhibits, 124.

Appellees see it as their mission to speak out on such matters in public, so that they may educate African-Americans, Hispanics, and Native Americans on how to conduct their lives, as well as engage others in some form of dialogue. *See* N.O.T., July 15, 2013, at 247-48, 253-54. Though appellees frequently expressed themselves in a manner which was not particularly conducive to measured, thoughtful discussion, it is equally true that their demonstrations addressed substantive and complex issues centering on the racial, religious, and gender-based dynamics that both divide and unite our nation.

Of course, not all speech that touches on matters of public concern comes within the ambit of the First Amendment. "[R]estrictions upon the content of speech [are permitted] in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382-83 (1992) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72

(1942)); *see, e.g., Roth v. United States*, 354 U.S. 476 (1957) (obscenity); *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (incitement); *Beauharnais v. Illinois*, 343 U.S. 250 (1952) (defamation); *Chaplinsky*, 315 U.S. 568 ("fighting words"). Unlike other, constitutionally protected types of discourse, this speech may be circumscribed, either completely or in part, based directly upon its substance. *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 744-46 (1978).

That having been said, this court determined that appellees' demonstrations did not fall within such exceptions. Though appellees' speech was offensive and provoked strong reactions from some passersby, it was not directed at specific individuals or geared towards inciting immediate, unlawful behavior. *See, e.g*:

THE COURT: "Do [Appellees] ever threaten the people who engage them with violence?" MS. SCARLETT: "I have never heard it, but I don't stand out there the whole time." N.O.T., July 15, 2013, at 141.

MR. FUNT (Appellees' attorney): "[Appellees] don't talk about specifics. They have a message about not wanting women to be whores, correct?" MS. SCARLETT: "Correct." MR. FUNT: "You have never seen them addressing a specific woman?" MS. SCARLETT: "Yes." *Id.* at 144.

THE COURT: "So [Appellees] don't contact individuals; in other words, they don't stop individuals and start yelling at them. Only the person starts yelling at the demonstrators?" MR. MUNIZCA: "I guess you could say that. It appears where [Appellees] have been hollering at somebody and then [that person] stop[s]

and challenge[s] them." *Id.* at 195.

Nor did these demonstrations block access to The Shops, or result in physical clashes, arrests, or violent incidents. *See* plaintiff's exhibits, 23, 24, 26 (pictures of appellees' post-preliminary injunction demonstrations); N.O.T., July 15, 2013, at 185 (Mr. Munizca stating that no violent incidents had occurred at the demonstrations); *id.* at 187 (THE COURT: Did you ever have to call the police for any kind of altercation? MR. MUNICZA: We have not. THE COURT: Has anyone been hurt? MR. MUNICZA: No, ma'am."); N.O.T., July 19, 2013, at 60 (Lieutenant O'Brien stating that no arrests have been made as a result of appellees' demonstrations).

Additionally, appellees' First Amendment protections were not diminished by their choice of venue. It is true that appellees' demonstrations were held in front of a premier Center City shopping location, where there is a great deal of foot traffic; however, throughout this country's history, public spaces have "been held in trust for the use of the [people] and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). Reflecting their "special position in terms of First Amendment protection," *United States v. Grace*, 461 U.S. 171, 180 (1983), these spaces, including "streets, sidewalks, and parks, are considered... [to be areas within which] the government's ability to permissibly restrict expressive conduct is very limited." *Id.* at 177. The space occupied by appellees during their demonstrations, on the sidewalk at the corner of Sixteenth and Chestnut Streets, is the very definition of

a public forum, meaning that this court could limit such use "only for weighty and substantial reasons." *Klebanoff v. McMonagle*, 552 A.2d 677, 678 (Pa. Super. Ct. 1988) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972)); *see also Startzell v. City of Philadelphia*, 533 F.3d 183, 196 (3d Cir. 2008) ("[T]he streets and sidewalks of Philadelphia[] [are] an undisputed quintessential public forum.").

If is also well-settled that lawful speech, even that which is directed towards harming the business interests of another, is protected by the First Amendment. *NAACP*, 458 U.S. at 909; *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 415-20 (1971); *Thornhill*, 310 U.S. at 102-3. Additionally, "[u]nder Pennsylvania law, 'peaceful [demonstrations] conducted in a lawful manner and for a lawful purpose [are] lawful, even though [they] shut[] down, bankrupt or put[] out of business [an affected] company or firm." *Franklin Chalfont Assocs. v. Kalikow*, 573 A.2d 550, 556 (Pa. Super. Ct. 1990) (quoting *Tate v. Philadelphia Transp. Co.*, 190 A.2d 316, 320 (Pa. 1963); *cf. William Goldman Theatres, Inc. v. Dana*, 173 A.2d 59, 62 (Pa. 1961) ("Article I, Section 7, of the Pennsylvania Constitution...prohibit[s] the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege."). Absent illegal or otherwise impermissible conduct, both the federal and Pennsylvania Constitutions granted appellees the right to demonstrate on the sidewalk in front of The Shops, whether or not people complained or appellant' business was negatively impacted. *Keefe*, 402 U.S. at 419; *Kalikow*, 573 A.2d at 558.

This is not to suggest, however, that the First Amendment provides limitless rights to those who speak on matters of public concern in a public forum, as it is well-settled that "[e]ven protected speech is not permissible in all places and at all times." *Frisby v. Schultz*, 487 U.S. 474, 479 (1988) (quoting *Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*, 473 U.S. 788, 799 (1985)). Accordingly, the government may regulate expression, in a content-neutral manner, through "reasonable time, place, or manner restrictions...[that] are narrowly tailored to serve a significant governmental interest, and that... leave open ample alternative channels for communication." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).[15]

## 1. THE CIRCUMSTANCES DID NOT WARRANT THE ISSUANCE OF A PERMANENT INJUNCTION

Even greater scrutiny is required when a party's desired mechanism of relief comes in injunctive form. By their targeted nature, "[i]njunctions...carry greater risks of censorship and discriminatory application than do general ordinances." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994). Accordingly, a content-neutral injunction must "burden no more speech than necessary to serve a significant government interest," *Id.* at 765, and must be "couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." *Carroll*

---

15. In contrast, regulation that is content-based is valid only where it is "necessary to serve a compelling state interest and...is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

*v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968). This is critical, for, though "a speech-restricting injunction may not attack content *as content...* it lends itself just as readily to the targeted suppression of particular ideas." *Madsen*, 512 U.S. at 793 (Scalia, J., concurring) (emphasis in original).

The Pennsylvania Supreme Court has articulated a firm standard with regard to the issuance of permanent injunctions. In order for such an injunction to be warranted, "the party seeking relief 'must establish that his right to relief is clear, that an injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will result from refusing rather than granting the relief requested.'" *Kuznik v. Westmoreland Cnty. Bd. of Comm'rs*, 902 A.2d 476, 489 (Pa. 2006) (quoting *Harding v. Stickman*, 823 A.2d 1110, 1111 (Pa. Cmwlth. Ct. 2003). In contrast to requests for preliminary injunctions, which require that a party establish its need to prevent imminent and irreparable harm, a permanent injunction is proper "if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law." *Buffalo Twp. v. Jones*, 813 A.2d 659, 663 (Pa. 2002) (quoting *Soja v. Factoryville Sportsmen's Club*, 522 A.2d 1129, 1131 (Pa. Super. Ct. 1987). "Additionally, when reviewing the grant or denial of a final or permanent injunction, an appellate court's review is limited to determining whether the trial court committed an error of law." *Id.* at 664.

Given the character of appellees' demonstrations, as well as the governmental interests implicated by their presence on the sidewalk, the instant situation did not warrant the extreme remedy requested by appellant. Were this court to

have issued the desired permanent injunction, appellees would have been flatly barred from the sidewalk in front of The Shops, despite the constitutionally protected nature of their speech and choice of forum, and the absence of evidence justifying the granting of such relief. Though, as noted above, appellant tried to phrase its argument in the language of tort law, this was but a thinly-veiled attempt to obfuscate the true genesis of its displeasure: the repulsive tone of appellees' demonstrations. Appellant's angst is certainly understandable. There are many places where Philadelphians may decide to spend their hard-earned money and, given the choice, a person is certainly more likely to frequent establishments where they are not subject to racist, sexist, or homophobic rants; however, if the First Amendment is to serve its fundamental purpose, it must be construed "to protect even hurtful speech on public issues [so] that we do not stifle public debate," *Snyder*, 131 S. Ct. at 1220, even if, as a result, "we must put up with, and even pay for, a good deal of rubbish." *United States v. Ballard*, 322 U.S. 78, 95 (1944) (Jackson, J., dissenting). While appellees' speech can be understandably deemed completely offensive, it was not this court's place to shield appellant, its tenants and customers, or passersby from being upset or insulted, *Snyder*, 131 S. Ct. at 1219, or to protect appellant's purely economic interests from the effects of appellees' lawful activities. *Keefe*, 402 U.S. at 419; *Kalikow*, 573 A.2d at 558.

Instead, the role of this court was to ensure that appellees' demonstrations would not harm members of the public. This was accomplished through the aforementioned preliminary injunction, which ordered appellees to move

from the setback space to the sidewalk, placed reasonable restrictions upon their activities at that location, and strongly suggested that they get demonstration permits from the City of Philadelphia. Ceisler Order, May 24, 2013 at 2 -3. Appellees complied with these terms, committed no acts of violence, were never arrested, and did not pose a serious threat to public safety and order. In fact, due to the limited number of people involved, either as participants or spectators, appellees were not legally required to procure permits in order to conduct their demonstrations. *See* N.O.T., July 19, 2013, at 5-10, 41-44. Accordingly, as there was no legal basis for granting appellant's requested relief, this court refused to permanently enjoin appellees from demonstrating on the public sidewalk at the corner of Sixteenth and Chestnut Streets.

## D. THIS COURT DID NOT ABUSE ITS DISCRETION OR MISAPPLY THE LAW WITH REGARD TO ANY EVIDENTIARY RULINGS

Finally, appellant contends that this court "unduly limited [Appellant's] ability to present its case by denying [it] the ability to offer highly relevant evidence." Appellant's Statement of Errors, at 2; however, this argument is neither factually or legally-sound. It is well-settled that "decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law...[which was] harmful or prejudicial to the complaining party." *Hatwood v. Hosp. of the Univ. of Pennsylvania*, 55 A.3d 1229, 1239 (Pa. Super. Ct. 2012) (quoting *Reott v. Asia Trend, Inc.*, 7 A.3d 830, 839 (Pa. Super. Ct. 2010). Said discretion necessarily encompasses a trial court's determinations

regarding the scope of witness testimony. *Walls v. City of Philadelphia*, 646 A.2d 592, 596 (Pa. Commw. Ct. 1994); *see Com. v. Boxley*, 838 A.2d 608, 615 (Pa. 2003) (citing Pa. R.E. 611(a)(2)) ("[T]he trial court has the power to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence, to avoid needless waste of time."); *cf. Katz v. St. Mary Hosp.*, 816 A.2d 1125, 1128 (Pa. Super. Ct. 2003) (discretion regarding leading questions); *Com. v. Showers*, 681 A.2d 746, 755 (Pa. Super. Ct. 1996) (discretion regarding scope and manner of cross-examination). Reversal, by an appellate court, of a trial court's evidentiary ruling is proper only where "the law [was] overridden or misapplied, or the judgment exercised [was] manifestly unreasonable, or [was] the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record." *Schuenemann v. Dreemz, LLC*, 34 A.3d 94, 100 (Pa. Super. Ct. 2011) (quoting *Stumpf v. Nye*, 950 A.2d 1032, 1035-36 (Pa. Super. Ct. 2008).

Here, the injunction hearing lasted two full days, during g which this court curtailed appellant's questioning in a limited number of instances:

1. Appellant strayed into the realm of the hypothetical, and away from the fact-specific inquiries required by both tort law and the particulars of First Amendment speech protection. *See* N.O.T. July 19, 2013, at 54-56, 63;

2. Appellant began to touch upon irrelevant topics, such as whether appellees had insurance coverage or a bank account, neither of which had anything to do with appellees' behavior at their demonstrations. *See id.* at 82-83, 100-101;

3. Appellant introduced video evidence that showed appellees speaking in generally offensive terms, rather than that they singled out specific individuals for verbal abuse. *See id.* at 97-98.

Each of these decisions fell squarely within, and was justified by, this court's discretionary powers.[16] As such, this court did not commit reversible error with regard to any of its evidentiary rulings.

### III. CONCLUSION

For the aforementioned reasons, this court respectfully requests that the instant appeal be denied.

---

16. Additionally, there were a handful of occasions where this court merely expressed its desire that the proceeding not get bogged down by cumulative evidence or redundant questioning, without ordering the parties to take (or cease) specific action. Instead of taking issue with this court's requests or inclinations, appellant either willingly went along or simply appeared to drop the matter. *See* N.O.T. July 15, 2013, at 167-70 (Appellant's counsel says that he'd like to call Theresa Sylvester and her mother as witnesses. Court tells parties it would prefer that they stipulate to the Sylvester's being offended by appellees. Appellees' counsel says that he'll talk with appellant's counsel about this. Neither side raises issue again); *id.* at 174 (Appellant's counsel says that he'd like to redirect Jill Scarlett, but that he can tell that this court would prefer to move on. This court agrees that this is true. Appellant's counsel decides to call his next witness instead).